IN RE ESTATE OF FRANK GISLER.
MARY GREEN, appellee, v. HENRY GISLER, appellant.

No. 47851.

(Reported in 48 N.W.2d 866)

934

Kean & Heffernan, of Dubuque, for appellant.

Rees & Remley, of Anamosa, for appellee.

Garfield, J.—Frank Gisler died October 16, 1949. His will dated five days earlier provides in part:

"Third, I give my farm known as the home farm to my brother Henry Gisler, and also all of my share of the personal property on said farm. * * *

"Fourth, I give my farm known as the Gavin farm to my sister, Mary Green, and also give her all my share in the personal property located on said farm."

Mary Green as executrix of the probated will and individually brought this action against her brother Henry Gisler for construction of the will to determine what land was included in each of these two devises. Henry also asked for construction of the will in this respect.

Testator left 560 acres of land shown by the accompanying plat. It is conceded the E½ of the NE¼ and the NE¼ of the SE¼ of section 8, shown on the plat in woven crosshatch, and the W½ of the NW¼ and the NW¼ of the SW¼ of section 9, shown on the plat in vertical crosshatch (240 acres in all), pass to Henry under paragraph Third. It is also conceded the E½ of the NW¼, the S½ of the NE¼ and the N½ of the SE¼, all shown in diagonal crosshatch (also 240 acres), go to Mary under paragraph Fourth.

The controversy is over which devisee should receive the two remaining forty-acre tracts, the SW¼ of the SW¼ of section 4 (on the north) and the NE¼ of the SW¼ of section 9 (in the middle of the south row of forties), both shown on the plat in horizontal crosshatch. In the trial court each litigant claimed

both these forties. Following trial in equity the north forty in controversy was awarded Henry as part of the "farm known as the home farm" and the south forty in controversy was awarded Mary as part of the "farm known as the Gavin farm." Henry has appealed, claiming the last mentioned forty should also have been awarded him.

The west 120 acres, shown on the plat in woven crosshatch, were owned by testator's parents when his father died in 1911. Testator then took over the management and operation of this tract. He and his mother continued to live there much of the time until the mother's death in 1934. Testator acquired title to the 120 acres under his mother's will and by deeds from the remaining devisees of his mother made in 1935. This tract constitutes the original home farm.

In 1915 testator acquired by deed from the guardian of one Ryan the 120 acres in vertical crosshatch adjoining the original home farm on the east. This tract was then known as the Ryan farm and was frequently so referred to thereafter.

Testator obtained the two forties in controversy (shown in horizontal crosshatch) in 1929 from a bank in Cascade. The bank had acquired them from James Gavin. The south forty was frequently referred to as Dick's forty. It had belonged to Dick Allen about fifty years before the trial. The north forty was frequently called the timber forty. There is also evidence the two forties were spoken of as the James Gavin farm or eighty.

The remaining 240 acres owned by testator at his death (shown in diagonal crosshatch) were deeded to him in 1933 by the receiver of the Cascade bank which had acquired the land by foreclosure against *Charles* Gavin, the former owner. This tract was frequently referred to as the Charles Gavin farm.

There were never more than two sets of buildings on the 560 acres owned by testator. Each is shown on the plat by the letter "X". The buildings on the home farm are a little east of the center of the northeast quarter of section 8. The buildings on the Charles Gavin farm are somewhat east of the center of section 9.

After testator acquired the two forties in controversy in 1929 they were farmed as a unit along with the home 120 acres and the Ryan 120 acres. (320 acres in all) at least until 1933, when he obtained the Charles Gavin 240 acres, and perhaps until 1938. Before 1929 the original home farm of 120 acres and the Ryan 120 acres seem to have been operated as a unit.

Other facts will be referred to later.

It is plain there is a latent ambiguity in the will as to what is included in "my farm known as the home farm" and "my farm known as the Gavin farm." The subject of each devise is

not described except in the words just quoted. This makes proper, indeed essential, the introduction of extrinsic evidence to identify the land included in each devise. See International Harvester Co. v. Bye, 184 Iowa 1053, 1055, 1056, 169 N.W. 382, 383, where the will devised "my homestead property"; annotation 94 A.L.R. 26, 131, 155. See also Odens v. Veen, 234 Iowa 1029, 14. N.W.2d 705; Boehm v. Rohlfs, 224 Iowa 226, 233, 276.N.W. 105.

For the definition of "latent ambiguity" see In re Estate of Lepley, 235 Iowa 664, 670, 17 N.W.2d 526, 529; annotation 94 A.L.R. 26, 46; 57 Am. Jur., Wills, section 1042.

Of course the purpose of construing a will is to ascertain the intent of the testator. Layton v. Tucker, 237 Iowa 623, 625, 23 N.W.2d 297, 298, and citations; In re Estate of Syverson, 239 Iowa 800, 804, 32 N.W.2d 799, 801, which involves a will somewhat like that now before us, although there the two farms were more definitely described by stating the acreage in each and were about a mile and a half apart. What land was included in the two farms devised in the Syverson case was not there in issue.

57 Am. Jur., Wills, section 1342, states:

"In determining what passes under a devise of a 'farm' or a 'plantation,' the intention of the testator is, of course, controlling and will be given effect when it can be ascertained. * * *

"One of the commonest problems arising in connection with devises of the kind in question is whether distinct parcels of land owned by the testator are to be included in the property passing. The cases in general support the conclusion that if such parcels were used by the testator * * * for purposes incidental to the operation of a farm or plantation, or if the testator in his lifetime customarily regarded such parcels as a single unit, they will, in the absence of any contrary intention, be regarded as passing * * *."

Although the case is not entirely free from doubt we are not inclined to reverse the trial court's decision that the south forty in controversy should go to plaintiff as part of the devise to her in paragraph Fourth.

Testator doubtless intended to devise all his 560 acres by paragraphs Third and Fourth. No other provision of the will refers to any of his land. The will should therefore be so con-

strued that this south forty is considered part either of the "farm known as the home farm" under paragraph Third or of the "farm known as the Gavin farm" under paragraph Fourth.

Of course the forty now in controversy was not originally part of either the home farm or the Charles Gavin farm. If it was part of the farm known as the home farm or the one known as the Gavin farm when the will was made (and testator evidently then considered it part of one or the other) it is because of circumstances which arose after testator acquired it. It is perhaps true he considered this forty part of his home farm from 1929, when he bought it, until 1933, when he obtained the Charles Gavin 240 acres, or even until 1938. (However, as stated, testator did not acquire the legal title to the home 120 acres until 1934 and 1935.) Of course it does not necessarily follow that testator did not consider this forty part of what was known as the Gavin farm when he made his will in October 1949.

One persuasive fact in support of our decision is that since 1945 testator leased the forty now in controversy to the tenant on the Charles Gavin farm who farmed the whole 280 acres as one unit, except for eleven acres near the northwest corner of the Charles Gavin 240 which, because of topography, were fenced with land to the west of it and were not farmed by him. It is not claimed these eleven acres are part of the home farm.

This same tenant on the Charles Gavin farm rented the south half of the forty in controversy from 1938 to 1945 and farmed it together with the portion of that farm then occupied by him. During those seven years this tenant farmed only 165 acres of the Charles Gavin 240—in all, 185 acres.

We understand there has always been a fence along the west line of the forty now in controversy. Testator, however, removed the fence along its north line and there was no fence there for several years. From 1938 to 1945, while the south half of the forty was farmed by the tenant on the Charles Gavin farm, there was a temporary fence along the north side of this south half. Then in 1945 an east-and-west fence was built along the north side of a tract which included the forty in controversy and about five acres north of it. In other words, about five acres of the Charles Gavin 240 were then fenced in with the forty in controversy.

Not long after testator acquired the two James Gavin forties in 1929 the south fence along the north forty was removed, so there was no fence between that tract and the Ryan 120 acres south of it. Appellant says he removed this fence upon authority from testator and let the timber forty become part of the Ryan 120.

It appears that from 1945 testator leased the Charles Gavin 240 acres (except the eleven acres above-mentioned) and the south James Gavin forty under an arrangement whereby he and the tenant shared the crop and livestock equally.

There is evidence that in November 1939 testator made a written stock-share partnership agreement in which he referred to the forty now in controversy as "40 acres formerly known as the Charles Gavin premises." In December 1948 testator made a written lease to the present tenant of the land awarded appellant in which the leased premises were described as a "farm in Washington Township, Jones County, Iowa * * * containing 280 acres, more or less." This doubtless refers to the home 120, the Ryan 120 and the timber forty or north James Gavin forty, all of which testator apparently then considered one farm.

It is obvious the forty now in controversy is much more accessible to the buildings on the Charles Gavin farm than to those on the home farm and it can more conveniently be farmed along with the Charles Gavin 240. It is perhaps worthy of mention that our decision leaves the boundaries of each farm more regular than if appellant's contention were adopted. In this respect the construction of the will which appellee urges seems somewhat more reasonable. Of course we appreciate our function is to construe the will, not rewrite it.

We have carefully considered the contentions so ably pressed by appellant and will mention two of them. It is true there is evidence that a trail over the forty in controversy was at times (especially in winter) used for passage to and from the buildings on the home farm although this was not the usual way. Such occasional use of this forty was made even before testator acquired it. Whether appellee will attempt to prevent such use in the future does not appear.

It is doubtless true that the 280 acres awarded appellee are more valuable than those awarded appellant. The value of ap-

pellee's 280 is $60 to $65 an acre. Value of the home 120 and the Ryan 120 is about $20 per acre less. Value of the timber forty is only $10 to $20 an acre. These two devises would be more nearly equal in value if the forty in controversy were awarded appellant.

Appellant at this point relies on the rule that in the absence of an intention to the contrary it is presumed a testator intends each beneficiary standing in the same relation to him to receive an equal interest in his estate. See 69 C. J., Wills, section 1302, page 280. This rule is somewhat similar to the one that an interpretation is preferred which most nearly conforms to the statutory rule of descent and distribution. See Fletcher v. Fletcher, 200 Iowa 135, 204 N.W. 410; Marvick v. Donhowe, 191 Iowa 214, 217, 182 N.W. 182; Ellsworth College v. Carleton, 178 Iowa 845, 854, 160 N.W. 222. See also Schrader v. Schrader, 158 Iowa 85, 89, 139 N.W. 160.

The rule relied upon by appellant is not controlling here. Such a presumption is most frequently applied where the beneficiaries are children or grandchildren of a testator. The presumption is said to be strong that equality among a testator's children is intended. Re Laughlin Estate, 354 Pa. 43, 50, 46 A.2d 477, 480, 165 A.L.R. 891, 895; 57 Am. Jur., Wills, section 1157. Our attention has not been called to a decision where the presumption of equality is applied as between testator's brothers or sisters. In any event, it would seem to be less strong in such a case than where the beneficiaries are testator's children.

Further, this will negatives any intent on testator's part to treat his brother and sisters equally. Immediately following paragraphs Third and Fourth above-quoted, the will leaves $10,000 to one sister and $6000 to another.—Affirmed.

OLIVER, C.J., and BLISS, WENNERSTRUM, MULRONEY, SMITH, MANTZ, and HAYS, JJ., concur.

THOMPSON, J., takes no part.